## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number: **18-04579-jw**
Adversary Proceeding Number: **18-80072-jw**

**ORDER**

The relief set forth on the following pages, for a total of 17 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**11/02/2018**



*[signature]*

US Bankruptcy Judge
District of South Carolina

Entered: 11/02/2018

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Kevin M. Tydings,<br><br>　　　　　　　　　　Debtor(s). | C/A No. 18-04579-JW<br><br>Adv. Pro. No. 18-80072-JW<br><br>Chapter 13<br><br>**ORDER** |
| Kevin Tydings,<br><br>　　　　　　　　　　Plaintiff(s),<br><br>v.<br><br>Carrie Huber Tydings (Now Carrie Huber); Carolyn T. Peacock; Chestnutt, Clemmons & Peacock, P.A.,<br><br>　　　　　　　　　　Defendant(s). | |

This matter comes before the Court upon the Renewed *Ex Parte* Emergency Motion for a Temporary Restraining Order and Preliminary Injunction ("Motion") filed by Kevin Tydings ("Debtor") on September 28, 2018. The Court issued a preliminary order on the Motion on September 28, 2018, which scheduled an emergency hearing on the Motion. Carrie Huber ("Huber") and Huber's State Court attorney, Carolyn T. Peacock ("Peacock") filed a brief in response to the Motion on October 2, 2018. An emergency hearing was held on the Motion and the Court took the matter under advisement. Pursuant to Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052, the Court makes the following Findings of Fact and Conclusions of Law.[1]

## FINDINGS OF FACT

1.　　Debtor and Huber were married on December 28, 1996.

---

[1] To the extent the following findings of fact are conclusions of law, they are so adopted, and to the extent the following conclusions of law are findings of fact, they are so adopted.

2. On June 9, 2015, a Divorce Judgment was entered, divorcing Debtor and Huber ("Divorce Judgment"). The Divorce Judgment incorporated a Separation Agreement and Property Settlement ("Divorce Settlement") agreed to by Debtor and Huber to address the parties' claims regarding support, alimony and equitable distribution of marital property, including the establishment of payment obligations from Debtor to Huber.

3. On March 14, 2017, Huber filed a Motion for Show Cause Order with the District Court for Carteret County, North Carolina ("State Court"), alleging that Debtor had failed to comply with the Divorce Judgment, including payment obligations both in the nature of domestic support and property/debt division under the Divorce Settlement. The State Court issued an Order to Show Cause on March 16, 2017 ("First Order to Show Cause"), which required Debtor to appear and "show cause why he should not be punished as for contempt of Court" as to the alleged failure to comply with the Divorce Judgment.

4. On October 30, 2017, Huber filed a second Motion for Show Cause Order with the State Court, alleging that Debtor had failed to comply with the Divorce Judgment for failing to make child support payments required under the Divorce Settlement. The State Court issued a second Order to Show Cause on October 30, 2017 ("Second Order to Show Cause"), which again required Debtor to appear and "show cause why he should not be punished as for contempt of Court" as to the alleged failure to comply with the Divorce Judgment.

5. A trial on the First Order to Show Cause and Second Order to Show Cause was scheduled before the State Court for May 10 and 11, 2018.[2]

6. On May 7, 2018, Debtor filed a petition for relief under chapter 13 of the Bankruptcy Code ("First Bankruptcy Case").

---

[2] For purposes of this Order, the First Order to Show Cause and Second Order to Show Cause will be collectively referred to as the "First and Second Orders to Show Cause."

2

7. After receiving notice of the First Bankruptcy Case, the State Court proceeded with the trial on the First and Second Orders to Show Cause on May 10 and 11, 2018.

8. On August 1, 2018, the First Bankruptcy Case was dismissed for the failure to file a confirmable chapter 13 plan due in part to a claim in the amount of $176,452.60 filed by Huber. At the hearing on confirmation in the First Bankruptcy Case, Debtor's counsel indicated that Debtor would not contest the dismissal.

9. On August 17, 2018, Huber filed a third Motion for Show Cause Order, alleging that Debtor had failed to comply with the Divorce Judgment, including failing to make payments on the Divorce Settlement. Thereafter, the State Court issued a third Order to Show Cause ("Third Order to Show Cause"). A hearing on the Third Order to Show Cause was scheduled for October 8, 2018 before the State Court.

10. Thereafter, a hearing was scheduled for September 7, 2018 before the State Court to announce a ruling from the May 10 and 11, 2018 trial on the First and Second Orders to Show Cause.

11. On September 5, 2018, Debtor filed a second petition for relief under chapter 13 of the Bankruptcy Code ("Second Bankruptcy Case").

12. On September 6, 2018, Debtor's bankruptcy counsel emailed a letter to the State Court indicating that Debtor had filed the Second Bankruptcy Case.

13. On September 7, 2018, the State Court held a hearing to announce a ruling from the May 10 and 11, 2018 trial. However, the State Court did not issue a ruling on the payment obligations under the Divorce Settlement which were the subject of the First and Second Orders to Show Cause, rather it held Debtor in contempt, sentencing Debtor to serve 10 days in jail for what the State Court described as "disrespecting the Court" ("Contempt Order") as a result of answers provided by Debtor to the Court's questions at the trial several months earlier.

14. After serving four days of the sentence, Debtor was released from jail upon posting bond and pending an appeal of the Contempt Order. A hearing on the appeal of the Contempt Order was originally scheduled for October 1, 2018.

15. On September 26, 2018, Debtor filed the present adversary proceeding against Huber and her State Court attorney, Peacock,[3] which included an *ex parte* Motion for Temporary Restraining Order and Preliminary Injunction ("First Motion") of the October 1, 2018 and October 8, 2018 hearings scheduled before the State Court.

16. On September 26, 2018, the Court denied the First Motion as it did not include a certification of counsel indicating the efforts to provide notice to opposing parties and why notice should not be required.

17. On September 28, 2018, Debtor filed the Motion.

18. Also on September 28, 2018, the Court entered an Order on the Motion indicating that the request for a temporary restraining order as to the October 1, 2018 hearing on the appeal of the Contempt Order was denied, and finding that a temporary restraining order for the October 8, 2018 hearing on the Third Order to Show Cause was not necessary as the Court would hold an emergency hearing, with notice to the parties, on the matter.

19. On October 2, 2018, Huber filed a brief in opposition to the Motion.

20. On October 3, 2018, the Court held a hearing on the Motion, at which the parties indicated that both State Court hearings were rescheduled as a result of Hurricane Florence, thus reducing the need for an immediate ruling on the Motion. According to the statements made by counsel at the hearing, the October 1, 2018 hearing on the appeal was rescheduled to November 5,

---

[3] Debtor has since filed an amended complaint on October 17, 2018 naming not only Peacock but also her law firm, Chestnutt, Clemmons & Peacock, P.A.

4

2018, while the October 8, 2018 hearing on the Third Order to Show Cause was rescheduled to October 22, 2018.

21. After the hearing on the Motion, in the afternoon of October 3, 2018, Debtor filed motion to extend the automatic stay in the bankruptcy case pursuant to 11 U.S.C. § 362(c)(3)(B) and a motion to expedite hearing.[4]

22. The Court held an emergency hearing on the motion to extend the automatic stay on October 5, 2018, at which time the parties agreed to a temporary extension of the automatic stay until after Debtor's scheduled confirmation hearing. As a result, an order was entered extending the automatic stay to November 15, 2018.

23. Thereafter, counsel for the parties indicated that the hearing on the Third Order to Show Cause, last scheduled for October 22, 2018, has been removed from the active trial docket due to the extension of the automatic stay.

## CONCLUSIONS OF LAW

The Motion requests the Court issue a temporary restraining order and preliminary injunction to stop the appeals hearing on the State Court's Contempt Order and the hearing on the Third Order to Show Cause.

At the emergency hearing on the Motion, the parties indicated that both the October 1 and October 8 hearings had been cancelled or rescheduled, and the parties presented arguments regarding whether further hearings should be enjoined. Since the parties had adequate notice to present their arguments and evidence to the Court, it no longer appears necessary to consider the request for a temporary restraining order, and the Court will only address the requests for a preliminary injunction at this time.

---

[4] Further references to the Bankruptcy Code (11 U.S.C. § 101, *et al.*) shall be by section number only.

5

*Standard for Preliminary Injunction*

Fed. R. Civ. P. 65, which is made applicable to this proceeding by Fed. R. Bankr. P. 7065, governs the procedures for preliminary injunctions. Specifically, the rule provides that the "court may issue a preliminary injunction only on notice to the adverse party."

"A preliminary injunction is an 'extraordinary remedy,' which may be awarded only upon a 'clear showing' that a plaintiff is entitled to such relief." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 607-08 (4th Cir. 2017) (citing *Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342 (4th Cir. 2009) (citing *Winter v. Natural Resources Defense Counsel, Inc.*, 555 U.S. 7 (2008))). Under the Fourth Circuit standard of review, "[a] preliminary injunction must be supported by four elements: (1) a likelihood of success on the merits; (2) that the plaintiff likely will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor, and (4) that a preliminary injunction is in the public interest." *Id.* at 608 (citing *Real Truth*, 575 F.3d at 346). The burden is on the party seeking the preliminary injunction to demonstrate these elements. *See Dewhurst v. Century Aluminum Co.*, 649 F.2d 287, 290 (4th Cir. 2011).

*Discharge and the Automatic Stay*

The present matter involves the intersection of domestic law issues, state court contempt procedures and federal bankruptcy laws, including the consideration of the payment and discharge of obligations resulting from a divorce decree, and the automatic stay.

A key benefit of federal bankruptcy laws is the discharge of pre-petition debts. Federal bankruptcy laws provide for the discharge of debts in a chapter 13 case under §§ 523 and 1328, which includes the discharge of a property settlement and related debt obligations resulting from state court divorce proceedings. While certain obligations which qualify as domestic support obligations as defined in § 101(14A) are not dischargeable under § 523(a)(5), such obligations

6

may be managed and paid through a chapter 13 plan. As a result, it is commonplace for debtors to treat their obligations from a divorce decree, including domestic support obligations, in a chapter 13 plan.

The Bankruptcy Code also provides a statutory automatic stay under § 362, which freezes most judicial proceedings, including state court proceedings, in order to provide a debtor with a breathing spell, and, in chapter 13 cases, provides an opportunity to propose a structured reorganization plan to repay creditors. Repayment through the chapter 13 plan benefits the debtor and provides protections to creditors by allowing for an orderly and centralized payment of claims. *See* H. R. Rep. No. 95–595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6296–97; S. Rep. No. 95–989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5835–36.

Section 362(a) provides in relevant part that a bankruptcy petition operates as a stay of:

(1) The commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy case], or to recover a claim against the debtor that arose before the commencement of the [bankruptcy case].
(2) The enforcement, against the debtor, or against property of these estate, of a judgment obtained before the commencement of the [bankruptcy case];
(3) Any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

Despite the broad scope of the automatic stay, the Bankruptcy Code provides exceptions, which permit certain proceedings to commence or continue regardless of the filing of a debtor's bankruptcy case. The exceptions which may be pertinent to this proceeding include: (1) "the commencement or continuation of a criminal action or proceeding against the debtor;" (2) "the collection of a domestic support obligation from property that is not property of the estate;" and (3) "with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute . . . ." *See* 11 U.S.C. §§ 362(b)(1), (b)(2)(B), & (b)(2)(C) (2018).

7

While the Bankruptcy Code permits the collection efforts of domestic support obligations from non-estate assets, the automatic stay significantly limits the collection of domestic support obligations from property of the estate. Further, in a chapter 13 case, a debtor's bankruptcy estate is encompassing because, under §§ 541 and 1306, the bankruptcy estate is comprised of all property acquired by the debtor (both pre-petition and post-petition) and debtor's post-petition earnings. As a result, most efforts to collect domestic support obligations from a chapter 13 debtor are stayed by the automatic stay, unless those efforts specifically fall into one of the listed exceptions—namely that the collection is from non-estate assets, or from a wage garnishment created by a judicial or administrative order or statute.

Therefore, several courts, including this Court, have held that § 362 stays a state court action against a debtor for civil contempt which is designed to enforce a non-excepted payment obligation under a divorce decree. *See Davis v. Blair (In re Davis)*, C/A No. 17-06271-JW, Adv. Pro. No. 18-80038-JW (Bankr. D.S.C. Oct. 3, 2018); *In re Repine*, 536 F.3d 512 (5th Cir. 2008); *In re DeSouza*, 493 B.R. 669 (1st Cir. B.A.P. 2013); *In re Gilford*, 567 B.R. 412 (Bankr. D. Mass. 2017); *In re Jordahl*, 555 B.R. 861 (Bankr. S.D. Ga. 2016); *In re Caffey*, 384 B.R. 297 (Bankr. S.D. Ala. 2008) aff'd 2010 WL 2508907 (11th Cir. 2010); *see also In re O'Brien*, 574 B.R. 369 (Bankr. N.D. Ga. 2017) (finding a willful violation of the stay when ex-spouse filed a post-petition contempt motion alleging debtor failed to comply with pre-petition state court order requiring the payment of attorney's fees under a domestic order related to paternity and child custody);

Also important, the automatic stay under § 362 is a self-executing federal law that stays matters and proceedings wherever located, even without notice of the bankruptcy filing. *See In re A.H. Robins Co., Inc.*, 63 B.R. 986, 988 (Bankr. E.D. Va. 1986) aff'd 839 F.2d 198 (4th Cir. 1988) ("The automatic stay is a self-executing provision of the Bankruptcy Code and begins to operate nationwide, without notice, once the debtor files its petition for relief."). Further, the consequences

8

of violating the stay are significant. Any action in violation of the stay is void *ab initio. See Weatherford v. TIMMARK (In re Weatherford)*, 413 B.R. 273, 283–84 (Bankr. D.S.C. 2009) (holding a judgment obtained in violation of the automatic stay is void *ab initio* and without legal effect). In addition, a party that willfully violates the automatic stay may be subject to sanctions and liability for damages under § 362(k).

Finally, while domestic support obligations generally result from a state court domestic order, the determination of whether an obligation under such an order is truly in the nature of a domestic support obligation as defined under § 101(14A), and therefore non-dischargeable under § 523(a), "is a factual determination made by the bankruptcy court as a matter of federal bankruptcy law." *In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998), *see also In re Fickling*, C/A No. 12-02719-jw, slip op. at p. 7 (Bankr. D.S.C. Oct. 2 2012) ("Federal Bankruptcy law governs the determination of whether a debt is in the nature of alimony, maintenance, or support."). "Because federal law, rather than state law, controls [the] inquiry, a domestic obligation can be deemed actually in the nature of support . . . even if it is not considered 'support' under state law." *In re Strickland*, 90 F.3d 444, 446 (11th Cir. 1996). As such a determination is the purview of the bankruptcy court, any post-petition proceedings in a state court in conflict with the bankruptcy court's determinations regarding the nature of the obligations under a divorce order may be determined to be void in violation of the automatic stay. *See McGuffin v. Barman (In re BHB Enters., LLC)*, C/A no. 97-01975-JW, Adv. Pro. No. 97-80201, 1997 WL 33344249 (Bankr. D.S.C. 1997) (finding that a state court's post-petition determination of a debtor's property interest in violation of the stay was not binding and void).

With this framework, the Court considers the Debtor's Motion.

9

*Need for Injunctive Relief*

As an initial consideration, the Court notes that injunctive relief sought by Debtor does not appear necessary under these circumstances in light of the self-executing effect of the automatic stay. The automatic stay is considered "a statutory injunction arising upon the commencement of the case; and the injunction is 'automatic' in that it arises without the necessity of a formal court order." *In re Alberts*, 381 B.R. 171, 176 (Bankr. W.D. Penn. 2008). Further, violations of the automatic stay can be severe. Any proceedings or orders occurring in violation of this "statutory injunction" are void and may expose parties acting against the stay to liability for damages resulting from the violation. This Court has found that due to these consequences, non-bankruptcy courts and parties appearing therein generally take heed of the automatic stay. While there may be circumstances where a court-ordered injunction issued pursuant to § 362 may be necessary, in most situations, including the present situation, the injunctive powers of § 362 appear sufficient to deter violative actions.

In the present case, the parties reported that the State Court has not yet held the hearings on the Third Order to Show Cause or the appeal of the Contempt Order, and has not indicated that it will proceed with the hearings pending this Court's consideration of the Motion. Therefore, the Court finds the more appropriate course of action is to make a preliminary review, based on the limited record established at the emergency hearing, of the application of the automatic stay to the State Court hearings in question, in lieu of issuing an injunction.[5]

---

[5] Huber argued that the United States Supreme Court's holdings in *Juidice v. Vail*, 430 U.S. 327 (1977) prohibits a bankruptcy court from enjoining a state court's contempt proceeding. Because the Court finds injunctive relief is not necessary in light of the automatic stay, it is not necessary for the Court to consider whether *Juidice* limits this Court's authority to order an injunction of state court contempt proceedings.

10

*Criminal Contempt Order*

The initial critical determination in this case is whether the Contempt Order is civil in nature and subject to the automatic stay or criminal in nature and therefore falls under the exception to the stay contained in § 362(b)(1). First, the Court notes that a state court's characterization of a contempt order as either criminal or civil in nature is not determinative, and bankruptcy courts must look to the purpose and character of the sanctions imposed to determine whether a contempt order is criminal or civil in nature. *United States v. Bayshore Assocs., Inc.*, 934 F.2d 1391, 1401 (6th Cir. 1991); *In re Goodson*, C/A No. 17-41820-JJR, 2018 WL 722461 at *9 (Bankr. N.D. Ala. Feb. 5, 2018).

To determine the nature of a contempt order, the Court examines the primary purpose of the contempt order. Civil contempt is remedial in nature with the purpose "to coerce the [party] into compliance with the court's order and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). On the other hand, "for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911).

As to a sanction involving incarceration, the sanction is often considered civil in nature if: (1) the party is confined indefinitely until the party complies with an affirmative command of the court, or (2) the imprisonment is for a fix term but provides the option for an early release upon compliance with an affirmative command. *Bagwell*, 512 U.S. at 828, 114 S.Ct. at 2557–58 (citations omitted). Whereas, "a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a 'completed act of disobedience' such that the contemnor cannot avoid or abbreviate the confinement through later compliance." *Id.* (quoting *Gompers*, 221 U.S. at 443, 31 S.Ct. at 498).

Finally, at least one court has considered whether the state court judge ordering the contempt sanctions had knowledge of the intervening bankruptcy filing. *See Goodson*, 2018 WL 722461 at *4 (holding that a criminal contempt order was actually civil in nature and noting that the proceeding began as a civil contempt matter but changed to a criminal contempt matter upon the state court judge becoming "incensed" by the debtor's intervening bankruptcy filing).

It is without dispute that the Contempt Order resulted from events occurring at the trial on the First and Second Order to Show Cause held on May 10 and 11, 2018 in the State Court. The trial was scheduled to compel compliance and to consider sanctions against Debtor for failing to pay obligations imposed upon him by the Divorce Settlement. Debtor asserts that since the May 10 and 11, 2018 hearings were held in violation of the automatic stay existing in his First Bankruptcy Case, the resulting Contempt Order issued on September 7, 2018 should be considered void as a matter of federal law. Debtor asserts that if the North Carolina Superior Court upholds the Contempt Order and he is required to complete his jail sentence, it will likely result in him losing his job and security clearance, which would jeopardize his ability to perform and repay all creditors under his chapter 13 plan.

To address the question, the Court first examines the language used in the First and Second Orders to Show Cause. In these orders, the central allegation raised is that Debtor had violated the Divorce Settlement by failing to make timely payments on obligations under that settlement. It is clear that by filing the motions for the First and Second Orders to Show Cause, Huber intended for the contempt matter to be remedial as an effort for Huber to collect on the alleged outstanding obligations from Debtor. As further evidence of the remedial nature of Huber's request, even after the issuance of the Contempt Order, Peacock inquired whether the State Court would order payments or other relief to Huber. This suggests the First and Second Orders to Show Cause, were, at least in part, civil in nature.

12

However, it appears that the language of the First and Second Orders to Show Cause was not limited to civil contempt. The First and Second Orders state that the proceedings are to permit Debtor "to show cause why he should not be punished as for contempt of Court," without reference to contempt being civil or criminal in nature. Therefore, the language of the First and Second Orders to Show Cause is inconclusive.

After the May 2018 trial, the course of the State Court proceedings took an unexpected turn. Despite having a two-day trial centered on Debtor's ability and failure to pay obligations under the Divorce Settlement, some four months later, the State Court, in ruling on the trial, held Debtor in criminal contempt for his conduct during the trial, specifically for a disrespectful answer to a question from the judge.

At the September 7, 2018 hearing, Judge Rowe, the judge proceeding over the State Court domestic proceedings, stated the following when issuing the Contempt Order:[6]

> **Judge Rowe:** I'll say this; I don't think I have ever done this where I really didn't lean towards what either attorney argued. I will say there was something on the stand that I just thought was complete disrespect for the court. And what that was was he was asked about unemployment and he said he didn't do that because it might affect his security clearance. So I asked him . . . what about just disobeying the court, and he did not even consider the court. I found that pretty offensive as an officer of the court, and so I am holding him in criminal contempt. Over time, I was just going with straight 30 days, but it is going to be 10. You need to have respect for the court and the court's orders. Alright, you're with the sheriff.
>
> **Attorney for Debtor:** Judge, that may cause him to lose his job.
>
> **Judge Rowe:** Well, I understand but he had so little respect for the court that he didn't care about that. I mean that is pretty much what he testified to. That he didn't even consider us in whether his security clearance would matter, but he did for unemployment. I just found that offensive.

---

[6] Due to the costs to obtain a transcript of the September 7, 2018 State Court hearing, the parties stipulated to the Court's consideration of an audio recording of that hearing and presented an authenticated copy to the Court.

13

When Peacock inquired about payment of arrears on the obligations of the Divorce Settlement, Judge Rowe did not order the payment of any arrears and responded:

> I don't think based on that ten days, I can order him to pay money. . . . I still think he is required to obey the other [order] . . . I guess the ultimate thing is this gets his attention that he ought to comply with [the Divorce Settlement] from this day forward or come back for another hearing.

Based upon these statements by Judge Rowe, it is a fair interpretation that the State Court's Contempt Order considered and concluded the matters raised in the First and Second Orders to Show Cause and the May 2018 trial. While it appears that the State Court intended to encourage compliance with the Divorce Settlement, the central purpose of the Contempt Order, as stated by the court, was to uphold the dignity of the State Court. Judge Rowe emphasized throughout his ruling that the contempt was punitive in nature due to Debtor's lack of respect to the Court and the Court's orders. The Contempt Order does not appear to provide any remedial benefit to Huber as the Contempt Order does not compel the payment of any of the alleged outstanding obligations owed to her. The Contempt Order also requires Debtor to be incarcerated for a set period of time (10 days), and his release is not controlled by compliance with an affirmative command, such as a payment to Huber.

While it appears that Judge Rowe knew of Debtor's first bankruptcy before considering the May 2018 trial, it is unclear from the record when he learned of the Debtor's present bankruptcy case. At the September 7, 2018 hearing, Judge Rowe issued his ruling prior to Debtor's State Court counsel indicating to the court that Debtor had again filed bankruptcy. However, Debtor's bankruptcy counsel has indicated that she contacted Judge Rowe's chambers on September 6, 2018 to report Debtor's filing of the Second Bankruptcy Case. Without further evidence, the Court cannot conclude at this stage of the proceeding that the nature and issuance of the Contempt Order was motivated or caused by the Debtor's filing of a bankruptcy case.

14

Considering the plain language used by § 362(b)(1) to except from the effect of the automatic stay "the continuation or initiation of a criminal proceeding," and the fact that Judge Rowe appears to base the Contempt Order on Debtor's conduct in a hearing before him, the Court is not prepared to conclude at this time that the automatic stay would bar the appeal hearing (requested by Debtor) of the Contempt Order. Weighing the limited evidence before the Court, it further appears appropriate to give deference to the state's appellate court on issues of North Carolina law related to the appeal. However, to be clear, this Court is likewise not precluding, after discovery and presentation of more facts, a finding that the Contempt Order and prosecution thereof violated the stay.

*Third Order to Show Cause*

Debtor's Motion also seeks, in part, for the Court to issue a temporary restraining order and injunction as to the hearing on the Third Order to Show Cause, which was originally scheduled to be heard post-petition on October 8, 2018 before the State Court. The Third Motion for Show Cause Order was filed pre-petition on August 17, 2018, prior to the existence of the automatic stay in this case, and requests the State Court punish Debtor for contempt as a result of his alleged failure to maintain health insurance policies for his minor children, failure to pay a mortgage and related household expenses, and failure to pay off credit cards and other marital debts.

The October 8, 2018 hearing was ultimately cancelled as a result of Hurricane Florence. Counsel for Huber has since indicated that the October 8, 2018 hearing has not been rescheduled and was removed from the trial docket due to the Court granting an extension of the automatic stay with the consent of the parties.[7]

---

[7] At the hearing on the Motion, counsel for Huber indicated that the Third Order to Show Cause is only civil in nature. It appears Huber is waiting until the final resolution of the extension of the automatic stay and confirmation and claims process to ensure that she does not violate the automatic stay. Due to the undetermined nature of the obligations, and the consequences of violating the automatic stay, this appears to be an advisable course of action.

15

Because the hearing on the Third Order to Show Cause has been removed from the State Court's trial docket due to the extension of the automatic stay, and because the automatic stay is self-executing and would void any matter determined in violation of it, as well as permit Debtor to recover damages for a willful violation of the stay, the Court finds it is not necessary to issue an injunction at this time as to the Third Order to Show Cause. To the extent the State Court resumes proceedings on the Third Order to Show Cause prior to this Court issuing a further order, Debtor may take necessary action in this Court to protect his rights afforded by the automatic stay.

## CONCLUSION

For the foregoing reasons, the Court hereby denies Debtor's Motion for temporary restraining order and injunction of the State Court hearings first as unnecessary due to the legal effect of the automatic stay, and further because, as to the hearing on the appeal of the Contempt Order, at this time there is insufficient evidence before the Court to conclude the Contempt Order is not excepted from the automatic stay pursuant to § 362(b)(1), and as to the hearing on the Third Order to Show Cause, the Defendants have discontinued prosecution in deference to the automatic stay and further consideration of the confirmation of Debtor's plan in this case. Nevertheless, the Court cautions the parties to observe the continuing effect of the automatic stay.

**AND IT IS SO ORDERED.**

Columbia, South Carolina
November 2, 2018